UNITED STATES of America,
Appellee,

v.

Philip BENTER, Appellant.

No. 514, Docket 71-2053.

United States Court of Appeals,
Second Circuit.

Argued Feb. 4, 1972.

Decided March 28, 1972.

H. Elliot Wales, New York City, N. Y., for appellant.

Edward R. Korman, Asst. U. S. Atty., Brooklyn, N. Y. (Robert A. Morse, U. S. Atty. for the E. D. N. Y., David G. Trager, Asst. U. S. Atty., on the brief), for appellee.

Before ANDERSON and OAKES, Circuit Judges, and CLARIE, District Judge.*

* Of the District of Connecticut, sitting by designation.

OAKES, Circuit Judge:

This appeal is from a jury conviction in the Eastern District of New York, Leo F. Rayfiel, Judge, for conspiracy (18 U.S.C. § 371) to commit bribery as a United States Government employee, in violation of 18 U.S.C. § 201(c). Appellant's principal claim is that he was prejudiced by the Government's summation, which included numerous references to him as "Honest Phil." At the close of the Government's case all eleven of the substantive counts charging receipt of bribes were dismissed for improper venue, since the bribes were paid in Maryland.

The heart of the case involved weighing the credibility of appellant, a long-time military contract specialist at Edgewood Arsenal, Maryland, against that of four Government witnesses—Barry and Leo Tepfer, the principals of a Government contractor (S. Tepfer & Sons, Inc.), Selig Chervin, the contract administrator for the Tepfer firm, and Jerome Migdal, a friend of appellant's and an acquaintance of Chervin. For testifying against Benter the Tepfers received formal immunity from prosecution; at the time of trial Chervin was still in business and Migdal was still a Post Office employee. The Government's proof—sufficiency isn't argued here—was that the Tepfers ultimately agreed to pay appellant $100,000, of which he received at least $44,500,[1] for his assistance in obtaining and meeting for S. Tepfer & Sons the obligations of contracts worth several million dollars.

In the Eastern District of New York the practice on closing argument is for the defense to open and the prosecution to close.[2] Accordingly, we have examined the final arguments of both counsel to determine the extent, if any, to which the prosecution was provoked by the defense into making shorthand characterizations and insinuations that—unprovoked—would be improper and prejudicial. See Viereck v. United States, 318 U.S. 236, 247–248, 63 S.Ct. 561, 87 L.Ed. 734 (1943); Berger v. United States, 295 U.S. 78, 88–89, 55 S.Ct. 629, 79 L. Ed. 1314 (1935); Hall v. United States, 419 F.2d 582 (5th Cir. 1969) (2–1 decision); cf. United States v. Isaza, 453 F.2d 1259 (2d Cir. 1972).

At the outset of defense counsel's summation, he referred to the Government witnesses as follows:

Were any of them prosecuted?

No, of course not. They all got away and they decided that they would get together, and the real conspiracy was an agreement to throw Phil Benter to the wolves, these four crooks. This was the real agreement.

Counsel also referred to them as "these evil people" and said ". . . these crooks who testified for the Government were not good liars and they tripped themselves up here and there." He went on to say that the Government was "stuck with these four crooks and they have founded their case on the weak, shifting sands of these four."

The structure of his argument was to analyze the story of each Government witness. Chervin was said not to have remembered "the story that they cooked up" and to be "[a] man who admits that he is a crook." Leo and Barry Tepfer were said to be "poor liars." Leo was characterized as "this evil man [who] takes his young son and brings him into this conspiracy"; Barry was depicted as "an admitted co-conspirator and a crook here." Again, "the crooks here are basically Chervin, the two Tepfers, and Migdal and nobody else."

Defense counsel emphasized that appellant "didn't have to testify," had

---

1. Chervin and Migdal also received some of the bribe money unbeknownst to the Tepfers.

2. Preliminarily, it should be noted that appellant did not object to the prosecution argument as it was being made. This is attributed by appellant to the trial judge's direction to counsel "not to interrupt the other's summation." What the court did ask, however, was that there be no interruption "unless there is the clearest of provocation for it." Evidently trial counsel thought such provocation lacking.

spent 28 years in Government service with an "unblemished record," and had "received awards." He suggested that the motives of the Government's witnesses were "to protect themselves and at the same time pick on a man who made it tough for them." Finally, counsel argued: "These crooks—all these crooks got away with it, and Phil Benter has to stand the brunt of this trial . . The Government's case is based on the story of these four miserable crooks. You have heard the defense. You heard all these clean people on the defense side. You heard Phil Benter, who has an absolutely unblemished record." The record discloses an effective and well-structured argument. What it does not disclose to appellate eyes is its impact on the jury, but one can surmise that the impact was not inconsiderable. The "art of advocacy" was well displayed.

Government counsel replied in kind, doubtless in the view that defense counsel's argument had made significant inroads into a compelling mound of evidence against appellant. This evidence included not only direct testimony from the "Government four" but also inference-producing proof, *inter alia,* that shortly after the continuing series of payments to Benter was commenced, he and his wife opened a safe deposit box to which they made 13 trips in 18 months, the last of which was just after Migdal said he told Benter of a visit from an FBI agent; that during this time Benter and his wife purchased several luxury items including jewelry, a mink cape and a third car (for which Benter paid $2,500 cash); and that Benter falsely stated to the jury that he had paid for the third car "with my son's money," a statement which was directly refuted at trial by his son.

The Government replies—objected to after, but not during, the summation— consisted in the main of two lines of ar-

gument, neither put in such a way as to be unobjectionable. First, counsel stated that if the jury thought "for one minute that this is a frame, that the United States Attorney's office and the FBI got together with the so-called four crooks and paraded them in here to frame this defendant, you should acquit him." [3] Secondly, he mocked the defense argument that "honest Phil Benter" is "the only one who told the truth." In this respect, the prosecutor made at least nine separate references to "Honest Phil."

■ The references to a "frame," while hardly expressed in language appropriate to the proper exercise of the prosecutorial function—which it will be remembered is not to win a case, but to see that justice is done—did serve to put, as appellant claims, the prestige of the United States Attorney's office and the FBI behind the Government's case. Ordinarily this is improper. *See* United States v. Puco, 436 F.2d 761, 762 (2d Cir. 1971) (2–1 decision). Here, however, the defense brought this line of argument on itself by the summation recounted above and particularly by the following unmistakable suggestion:

What about the other two? Chervin and Migdal. Well, they denied they got immunity, but you saw them here and they admitted they had not been indicted; no charges have been filed against them. They have not been prosecuted. Nothing has happened. Chervin is still in business, Migdal is still working for the United States Government as a mailman.

You can decide for yourselves whether or not there is an agreement.

They won't be prosecuted; they haven't been.

■■ The above defense point insinuated that there was an agreement between the Government and Chervin and Migdal for them to testify and, by implication, the plentiful references to the

3. Again, " . . . if they all got together with us, and I mean the United States Attorney, and with the FBI, to frame him, well, then go ahead and acquit him." Or, in a similar vein, "Everybody is a liar and this is one big frame."

Government's witnesses being "crooks" and "poor liars" constituted a charge that there was a "frame" of the defendant.[4] To this argument by inference the Government was entitled to reply and, as Judge Goodrich put it, ". . . some latitude must be given to lawyers' language in a hard fought case." United States v. Kravitz, 281 F.2d 581, 586 (3rd Cir. 1960), cert. denied, 364 U.S. 941, 81 S.Ct. 459, 5 L.Ed.2d 372 (1961) (footnote omitted). The form in which the reply is cast, if not objected to, generally is not plain error. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 238–239, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); United States v. Isaza, *supra,* 453 F.2d 1259.

But the numerous references to "Honest Phil"[5] are a horse of a different color. To be sure, the defense was that appellant had told the truth, and appellant, the evidence showed, had lied in one clear instance. But a federal court prosecution does not call for the flinging of first-name epithets at a defendant that might be commonplace in a second-rate movie or television script. This is beneath the dignity of the United States Attorney's office and of the United States as a sovereign.[6] "Cases brought on behalf of the United States should be conducted with a dignity worthy of the client." United States v. Sober, 281 F.2d 244, 251 (3rd Cir.) (Biggs, C. J., and Hastie, J., concurring), cert. denied, 364 U.S. 879, 81 S.Ct. 167, 5 L.Ed.2d 101 (1960).

We do not find justification for the prosecutor's remarks in the case law. United States v. Nowak, 448 F.2d 134, 140–141 (7th Cir. 1971), cert. denied, 404 U.S. 1039, 92 S.Ct. 714, 30 L.Ed.2d 731 (1972), cited to us by the Government, is authority only for the general proposition that "[a]n advocate is per-

mitted considerable latitude in replying to his opponent's arguments." United States v. Fortney, 399 F.2d 406, 408 (3rd Cir. 1968), upheld the trial court's ruling that the "unfortunate" remark of Government counsel in summation that "[t]he defendant wants the jury to infer that some other thief took the money" was a slip of the tongue. In United States v. Medlin, 353 F.2d 789, 795 (6th Cir. 1965), cert. denied, 384 U.S. 973, 86 S.Ct. 1860, 16 L.Ed.2d 683 (1966), Government counsel's references in closing to Judas Iscariot and Benedict Arnold were not construed by the court as references to the defendant. Calling defense witnesses liars, even though provoked by the claim that the prosecution had been instituted in bad faith, fell "just short" of reversible error in United States v. Sigal, 341 F.2d 837, 845 (3rd Cir.), cert. denied, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965), and should have prompted, according to the court, a "stern" rebuke by the trial judge who is, after all, responsible for seeing to it that a dignified and fair trial takes place.

True, references to defendants as "crooks," "germs" and "viruses" were held not prejudicial in United States v. Wolfson, 322 F.Supp. 798, 827 (D.Del. 1971) (and see cases collected at 826–827). True also, this court has not reversed convictions on the basis of a prosecutor's epithets in United States v. Guidarelli, 318 F.2d 523, 525 (2d Cir.), cert. denied, 375 U.S. 828, 84 S.Ct. 72, 11 L.Ed.2d 60 (1963) ("leech"), or United States v. Walker, 190 F.2d 481, 484 (2d Cir.), cert. denied, 342 U.S. 868, 72 S.Ct. 109, 96 L.Ed. 653 (1951) ("a type of worm"). However, none of those cases involved the repeated and persistent kind of prosecutorial misconduct that has been condemned in such cases as

4. This is, of course, a proper but risky defense argument. For an example of a highly successful defense argument along this line, see Clarence Darrow's argument in the *Kidd* case (1898) in Somewhere There Is a Conspiracy, in Attorney for the Damned 267 (A. Weinberg ed. 1957).

5. There was also a reference to "[a]ward-winning Benter."

6. We are advised by the briefs that the particular prosecutor involved is no longer with the office of the United States Attorney and has returned to the local prosecution office from which he came.

Hall v. United States, *supra*, 419 F.2d at 587 ("hoodlum"), and Getchell v. United States, 282 F.2d 681, 690–691 (5th Cir. 1960) (16 references to "con man" and other jargon). *See also* Volkmor v. United States, 13 F.2d 594, 595 (6th Cir. 1926).

We think the prosecutor's conduct was improper but in the circumstances of this case it did not constitute reversible error because there was ample evidence to justify conviction and Benter had indeed lied in reference to the payment for his third car.

We are reminded in summation cases that repeated rebukes of the prosecution by an appellate court without reversal may ultimately become "an attitude of helpless piety," and our "deprecatory words . . . purely ceremonial." Frank, J., dissenting in United States v. Antonelli Fireworks Co., 155 F.2d 631, 661 (2d Cir.), cert. denied, 329 U.S. 742, 67 S.Ct. 49, 91 L.Ed. 640 (1946). We trust that the rebukes in United States v. Isaza, *supra*, and here, however will not go unheeded by the prosecutorial staff involved, for another time the evidence of guilt may be less convincing and the likelihood of prejudicial error correspondingly higher.

Appellant's other points are without merit. The cross-examination of a character witness as to his personal opinion of the character of the accused was not objected to at the trial and is not plain error. *Compare* Michelson v. United States, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948), and Annot., 47 A.L.R.2d 1258 (1956), *with* the proposed Federal Rules of Evidence, 51 F.R.D. 348 (1971), Rule 405(a). Cross-examination of the witnesses Chervin and Migdal was not unduly limited in reference to their so-called life style, since there was considerable evidence showing that they had participated in the scheme and profited materially by it. United States v. Smolin, 182 F.2d 782, 786 (2d Cir. 1950), is an effective answer to the argument that, since the substantive crime necessarily involves a concert of action, there can be no conspiracy charge, United States v. Sager, 49 F.2d 725, 727 (2d Cir. 1931), for here the agreement involved more participants than were necessary for the commission of the substantive offense. Moreover, the substantive counts were dismissed after jeopardy attached.

Judgment affirmed.