# SUPREME COURT OF THE UNITED STATES

## WILLARD ANTHONY *v.* LOUISIANA

ON PETITION FOR WRIT OF CERTIORARI TO THE COURT OF
APPEAL OF LOUISIANA, FIFTH CIRCUIT

No. 21–993.   Decided November 7, 2022

The petition for a writ of certiorari is denied.

JUSTICE SOTOMAYOR, with whom JUSTICE JACKSON joins, dissenting from the denial of certiorari.

Petitioner Willard Anthony was charged with several counts related to sex trafficking. At trial, the State called two witnesses who testified that they witnessed and experienced physical and sexual abuse by Anthony. Defense counsel sought to impeach these witnesses, who had been arrested but not charged with prostitution, by suggesting they may have negotiated a deal in exchange for their testimony. To rebut this suggestion, the State called as a witness the prosecutor who presented Anthony's case to the grand jury. The prosecutor's testimony, however, went far beyond that limited purpose. Spanning 70 transcript pages, and over defense counsel's repeated and vociferous objections and motions for mistrial, the grand jury prosecutor expressed his belief that Anthony was guilty beyond a reasonable doubt, referenced his own investigation and evidence outside of the record, testified that he believed the State's two witnesses were credible, and bolstered his own credibility by reiterating the sworn oath he took as a prosecutor. Anthony was subsequently convicted and sentenced to life without the possibility of parole.

The prosecutorial misconduct in this case is not only blatant and egregious, but a clear due process violation. The court below nonetheless held that admission of the prosecutor's testimony was harmless error. The court reached this

holding after applying an incorrect harmless-error stand-
ard and disregarding compelling record evidence of preju-
dice. Because the court below clearly misapplied existing
law in a manner that denies fundamental justice, I would
summarily reverse.

I

Willard Anthony was indicted by a grand jury in Jeffer-
son Parish, Louisiana, on two counts of aggravated rape
and one count each of human trafficking, aggravated bat-
tery, second-degree battery, and possessing a firearm as a
felon. At trial, Anthony conceded his guilt to being a felon
in possession of a gun and to second-degree battery. He de-
nied, however, charges that he raped a woman known as
C. W., that he forced either C. W. or another woman known
as Lee to work as a prostitute, and that he ever attacked
C. W. with a gun. To carry its burden of proving the re-
maining counts of aggravated rape, human trafficking, ag-
gravated battery, and sexual battery, the State relied al-
most entirely on testimony from C. W. and Lee themselves.[1]

Defense counsel sought to impeach and discredit those
witnesses on cross-examination. Defense counsel pressed
Lee on the fact that she had been arrested for prostitution
and possession of cocaine, but that she had not been
charged. Counsel asked "[y]ou certainly expect the District
Attorney's Office to help you with [those potential charges],
correct?" Tr. 53 (Dec. 10, 2016) (12/10 Tr.). Counsel also
suggested that Lee had a motivation to curry favor with the
prosecution, but Lee denied that she had made any deal

_____

[1] The physical evidence in the record included C. W.'s vaginal swab,
which did not exclude Anthony's profile; DNA evidence from Anthony's
gun that did not exclude C. W.'s, Anthony's, or a codefendant's profile;
and cell phone records that confirmed that Anthony had posted pictures
of C. W. and Lee on the internet. This evidence was consistent with An-
thony's testimony that he had consensual sex with C. W., that he posted
advertisements of C. W., Lee, and Grisby with their consent, and that
C. W. had handled his gun, which he left unattended.

with the district attorney's office in exchange for her testimony.[2]

After Lee testified, the State called as a witness Assistant District Attorney (ADA) Thomas Block, the prosecutor who presented Anthony's case to the grand jury, ostensibly to rebut defense counsel's inference that Lee had made an agreement with the district attorney's office in exchange for her testimony. Instead, ADA Block began his testimony by explaining grand jury procedures. He testified, over objection, that he had "an obligation not to present what [he] believe[d] to be perjure[d] testimony." *Id.,* at 95. ADA Block elaborated: "[T]he only evidence that I present to a grand jury would be evidence that would be legally admissible in a court of law. I have a responsibility based upon my oath that I have taken to be an Assistant District Attorney as well as an officer of the Court and I take my job very seriously." *Id.,* at 100.

ADA Block then confirmed that his office did not file charges against Lee, but his testimony did not conclude there. The State asked ADA Block if he was aware of the information that the jury had already heard about Lee on her cross-examination, referring to the claim that Lee had worked as a prostitute and had been arrested for possessing cocaine. ADA Block testified, over objection, that he was aware of that information, as well as "police reports and . . . interviews that the detectives had done" with Lee and with another woman, Brittany Grisby, who was arrested along with Lee and C. W., and who did not testify at the trial. *Id.,* at 104. Asked again why Lee or C. W. were not charged after they had been arrested, ADA Block testified, again

——————
[2] Later in the trial, after Assistant District Attorney (ADA) Thomas Block testified, the government called C. W. as a witness. Defense counsel similarly cross-examined C. W. on her prostitution history, her drug and alcohol use during the events about which she testified, her prior felony convictions, and her recent arrest on an outstanding Florida warrant.

over objection,[3] to the legal conclusion that "[Lee] has an affirmative defense to the charges of prostitution . . . insofar as she was a victim of human trafficking as a result of his actions, Willard Anthony's actions." *Id.,* at 105. Defense counsel moved for a mistrial, which the trial court denied.

The State then focused ADA Block on the drug charges and battery charges that were initially part of Lee's arrest. ADA Block acknowledged that Lee and Grisby both hit C. W., but opined, over repeated objections and a further motion for mistrial,[4] that he had met and interviewed C. W., and concluded that Lee and Grisby hit C. W. specifically "because they were told to do so by Willard Anthony and they recognized that if they did not comply with his demands to beat [C. W.] after he had already beaten her, that they themselves would have sustained beatings." *Id.,* at 110. Regarding cocaine found in a motel room occupied by Lee, Grisby, and C. W. when they were all arrested, ADA Block explained to the jury that he "knew based upon the investigation that the defendants . . . were using drugs as a means to get the three ladies or the three female victims to commit the crimes for them as it relates to the human trafficking. That was just one of the things that they used to gain control over the females." *Id.,* at 115.

ADA Block confirmed that he had not made a deal with Lee, and reiterated that "as an officer of the Court and a representative of the people of Jefferson Parish and the

───────────

[3] Here, defense counsel objected on the ground that ADA Block was "giving an opinion as to the credibility of Ms. Lee." 12/10 Tr. 106. Counsel explained: "[ADA Block] can't testify personally, his personal opinion based on this. You can't do that. I believe that's reversible error." *Id.,* at 107. The trial court overruled the objection.

[4] In one objection, defense counsel explained: "[ADA Block] can't sit here and comment on a witness' credibility before she's testified at this point. You can't, you can't support a witness like this. It's up to the jury to make that decision, not this man." *Id.*, at 112. The trial court overruled the objection. Defense counsel again moved for a mistrial, which the trial court also denied.

State of Louisiana," he had an obligation to decline charges that cannot be proved beyond a reasonable doubt. *Ibid.* When asked if ADA Block had tried to curry favor with Lee, he said no, and testified that Lee was "a victim." *Id.,* at 117. ADA Block reiterated that Lee did not receive a benefit from testifying, telling the jury that "[u]ltimately, she was going to have to come before you . . . and tell her story and then it would be up to you to determine whether or not you believed her." *Ibid.* Defense counsel raised an "ongoing objection." *Ibid.*

On cross-examination, defense counsel sought to question ADA Block about the limited and nonadversarial nature of grand jury proceedings, but the trial court sustained the State's objections to any questions involving the grand jury. At a bench conference, defense counsel argued that such questioning was necessary because ADA Block had vouched for the credibility of the State's witnesses, but the trial court disagreed, finding that ADA Block "testified as to what he has done regarding the [grand jury] screening process and the affirmative defenses available to these women." *Id.,* at 125. Defense counsel again moved for a mistrial, which the trial court again denied.

On redirect, ADA Block reiterated that he did not bring charges against Lee or nontestifying witness Grisby because in his view "[t]hey were victims. They were witnesses to the abuse of [C. W.]." *Id.,* at 155. ADA Block testified that there was consistency between what Lee and Grisby had told him. Defense counsel objected once more, this time because Grisby had not testified at trial; the trial court once again overruled the objection. ADA Block continued: "I believe that [Lee and Grisby] have an affirmative defense. I believe that they were victims of Willard Anthony . . . on a human trafficking, sex trafficking enterprise. I believe that they were witnesses to the crimes that this defendant before you stands accused of." *Id.,* at 156. Seemingly addressing the jury directly, ADA Block testified: "I would never in

good conscience bring charges against them for the reasons I have stated to you, ladies and gentlemen, today." *Ibid.* When asked by the State whether ADA Block would prosecute Lee or Grisby, ADA Block answered "I would not do that . . . for the reasons I've stated. They are victims of sex trafficking." *Id.,* at 158. ADA Block emphasized: "I have a responsibility and obligation as an officer of the Court when I was sworn in in 1993 as a lawyer and then sworn in as a prosecutor to prosecute in good faith pursuant to the laws in the State of Louisiana and take only those cases that we can prove beyond a reasonable doubt." *Ibid.*

The State, in its closing argument, reminded the jury of ADA Block's testimony, asking (over defense counsel's objection, which the trial court overruled): "You understand why the charges were refused against Ms. Grisby and Ms. Lee? No back room deals. . . . There are no deals here." Tr. 256–258 (Dec. 11, 2016). The jury convicted Anthony on all counts, and the judge sentenced him to an aggregate life without the possibility of parole sentence.

## II

The Court of Appeal of Louisiana, Fifth Circuit, vacated Anthony's convictions on direct appeal. The court recognized that "a prosecutor may assume the dual role of witness and advocate only under extraordinary circumstances." 2017–372, p. 15 (La. App. 5 Cir. 2/20/19), 266 So. 3d 415, 426. "The danger," the court observed, "is that the jury might give inordinate weight to the prosecutor's testimony." *Ibid.*

Applying those principles here, the court concluded that "Mr. Block's testimony exceeded the scope permissible for a fair and impartial trial" in violation of Anthony's constitutional rights to due process and a fair trial. *Id.,* at 426–427. That was so, the court reasoned, because ADA Block "vouched for the credibility of the State witnesses," suggested that he "was aware of further evidence that was not

presented to the jury," and "improperly commented on [Anthony's] guilt." *Id.,* at 427–428. ADA Block did so "while using the prestige and dignity of his office to bolster the State's case." *Id.,* at 427. The court accordingly found that ADA Block's testimony amounted to structural error because the testimony violated Anthony's right to a "presumption of innocence." *Id.,* at 430.

In a *per curiam* opinion, the Louisiana Supreme Court vacated and remanded the Court of Appeal's decision on the ground that the lower court should have applied harmless-error analysis, not the structural-error doctrine. On remand, Judge Liljeberg of the Court of Appeal, who had authored the prior opinion, recused himself on the ground that "the facts and merits of this particular case were made a primary issue during [his] campaign for the Louisiana Supreme Court." App. to Pet. for Cert. 33a.[5]

In a split decision, the new Court of Appeal panel affirmed the conviction. All three judges agreed that Anthony's convictions for possession of a firearm and second-degree battery were valid. The majority upheld Anthony's other convictions, finding ADA Block's testimony to be harmless error. The majority reasoned that "the record shows that there was sufficient evidence to support defendant's convictions." 2017–372, p. 12 (La. App. 5 Cir. 12/30/20), 309 So. 3d 912, 923. In light of the "volume and strength of evidence introduced at trial in support of defendant's convictions," the majority concluded that ADA Block's testimony was harmless error. *Id.,* at 924.

——————

[5] For instance, one TV advertisement against Judge Liljeberg charged that Judge Liljeberg had made a "'reckless decision'" favoring "'a monster'" (Anthony): "'It didn't matter the victim was beaten, strangled and forced into a prostitution ring . . . . Liljeberg still sided with the criminal. It was wrong.'" J. Simerman, Ad War Heats Up Louisiana Supreme Court Race With a Week to Go, NOLA.com (Nov. 9, 2019), https://www.nola.com/news/politics/elections/article_fb7e524e-0323-11ea-a4c9-1f07984fbd56.html.

Judge Wicker dissented. She began by cataloging the errors the trial court committed by permitting ADA Block's wide-ranging testimony, explaining that ADA Block "usurped the exclusive province of the jury to weigh the evidence, including the credibility of all witnesses"; "testified concerning evidence the State received from Brittany Grisby, a witness who did not testify at trial"; "bolstered the credibility of State's witnesses"; and "gave an opinion as to the ultimate issue of fact: the Defendant's guilt beyond a reasonable doubt." *Id.,* at 931. Judge Wicker concluded that ADA Block's testimony was "much more egregious" than cases in which a prosecutor made impermissible statements during closing argument, because ADA Block "was a sworn witness," presenting evidence "to be considered by the jury in its deliberations." *Id.,* at 944. Applying the proper harmless-error standard, Judge Wicker explained, there was a reasonable possibility the evidence complained of might have contributed to the conviction. *Id.,* at 945.

The Supreme Court of Louisiana declined a writ of certiorari, with Justice Hughes noting his dissent for the reasons stated by Judge Wicker. 2021–00176 (La. 10/12/21), 325 So. 3d 1067.

## III

## A

This Court has explained that prosecutorial misconduct may rise to a due process violation in different circumstances, including when a prosecutor "vouche[s] for the credibility of witnesses," *United States* v. *Robinson*, 485 U. S. 25, 33, n. 5 (1988), "express[es] his personal opinion concerning the guilt of the accused," *United States* v. *Young*, 470 U. S. 1, 18 (1985), or "suggest[s] by his questions that statements had been made to him personally out of court," *Berger* v. *United States*, 295 U. S. 78, 84 (1935). The ultimate question has been whether a prosecutor's conduct "so infected the trial with unfairness as to make the resulting

conviction a denial of due process." *Donnelly* v. *DeChristo-foro*, 416 U. S. 637, 643 (1974).

The Court in *Young* identified at least "two dangers" to help determine whether misconduct rises to the level of a due process violation. 470 U. S., at 18. First, a prosecutor may convey to the jury the impression that the prosecutor is aware of information, unknown to the jury, that suggests the defendant's guilt. *Ibid.* Second, the prosecutor's opinion may "carr[y] with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *Id.,* at 18–19. When these dangers arise, they implicate due process because they "jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury." *Id.,* at 18.

This case involves all three examples of misconduct present in prior cases and presents both dangers discussed in *Young.* The Court of Appeal therefore correctly concluded, in its first decision, that ADA Block's testimony constituted a violation of Anthony's due process rights.[6] ADA Block vouched for C. W.'s and Lee's credibility, opining that they were victims of Anthony's crimes and imploring the jury that Lee "deserves respect." 12/10 Tr. 117. Most explicitly, ADA Block testified that C. W.'s and Lee's "statements were corroborated as to [Anthony's] actions," based upon his view of "the totality of the circumstances." *Id.,* at 140.

ADA Block also repeatedly testified that he believed Anthony was guilty. He testified that he did not bring charges against Lee, C. W., or Grisby because he believed that they were victims of Anthony's sex trafficking. See *id.,* at 104–105 ("Based upon the actions of Willard Anthony," Lee had "an affirmative defense" because "she was a victim of human trafficking as a result of . . . Anthony's actions"). ADA

——————
[6] The Court need not, and does not, decide whether ADA Block's testimony constituted structural error.

Block further communicated his belief in Anthony's guilt by testifying that he had a responsibility to "take only those cases that we can prove beyond a reasonable doubt," unmistakably signaling his view that Anthony was guilty beyond a reasonable doubt. *Id.,* at 158. ADA Block directly testified: "I know that Willard Anthony assaulted [C. W.] with a handgun; threatened to kill her; beat her; strangled her; choked her to the point of unconsciousness." *Id.,* at 141.

ADA Block did not merely suggest that he knew of evidence that was not before the jury, he said so. ADA Block testified that in deciding to bring charges against Anthony, he had reviewed extra record police reports and interviews with Grisby, a witness who did not testify. He further testified that Grisby's out-of-trial interview corroborated the accounts of C. W. and Lee, the State's key witnesses. ADA Block's testimony thus informed the jury of outside evidence that bolstered the credibility of the State's witnesses. ADA Block also testified that he had personal knowledge, outside of the evidence admitted at trial, that Anthony "us[ed] drugs as a means" to lure women into prostitution. *Id.,* at 115.

ADA Block made these comments while also invoking the *imprimatur* of his office. Several times he remarked on his "responsibility and obligation" as an officer of the court, *id.,* at 158, referencing the oath he took to become an assistant district attorney, *id.,* at 100. More disturbingly, he did so as a sworn witness. In the context of closing arguments, where the prosecutor is clearly speaking as an advocate, courts give prosecutors some leeway to comment on the evidence. Even in that context, however, "it is the height of summation misconduct for a prosecutor to argue to the jury his personal opinion as to a defendant's guilt." *Bellamy* v. *New York*, 914 F. 3d 727, 763 (CA2 2019); see also *Robinson*, 485 U. S., at 33, n. 5. This context is more serious. ADA Block appeared before the jury as a sworn witness, presenting evidence that could be considered in the jury's

deliberations. In that capacity, while underscoring his obligation as a prosecutor, ADA Block told the jury that he personally believed in the credibility of the State's witnesses, that Anthony was guilty, and that other evidence outside of the record confirmed Anthony's guilt.

B

Finding that ADA Block's testimony rose to the level of a due process violation does not end the matter, because constitutional errors may nevertheless be harmless. In assessing whether this error was harmless, however, the Court of Appeal of Louisiana applied a standard that is contrary to settled precedent. The majority below found the error harmless because "[t]he evidence at trial supports defendant's convictions, even excluding Mr. Block's testimony." 309 So. 3d, at 922. At no point did the majority consider the specific effect of ADA Block's testimony on the jury's verdict, except as to one passing reference asserting that the two convictions to which Anthony confessed (which are no longer at issue) "were surely unattributable to any alleged error in admitting Mr. Block's testimony." *Ibid.* In other words, the majority's reasoning with respect to the contested counts of conviction was based solely on the sufficiency of the evidence that remained after excising ADA Block's testimony.

This Court has repeatedly repudiated such an approach. As a species of harmless-error review generally, review of constitutional error in a criminal trial does not ask an appellate court to assess "whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered." *Sullivan* v. *Louisiana*, 508 U. S. 275, 279 (1993); see also *Kotteakos* v. *United States*, 328 U. S. 750, 765 (1946) (holding, as a general matter, that the harmless-error inquiry "cannot be merely whether there was enough to support the result, apart from the phase affected by the error"). Instead, *Chapman* v. *California*, 386 U. S. 18

(1967), requires that the government bear the burden of proving "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained," *id.*, at 24, with the appellate court focusing on "the guilty verdict actually rendered in *this* trial," *Sullivan*, 508 U. S., at 279. "That must be so, because to hypothesize a guilty verdict that was never in fact rendered—no matter how inescapable the findings to support that verdict might be—would violate the jury-trial guarantee." *Id.,* at 279–280.

Although the court below correctly recognized that the *Chapman* standard governed, see 309 So. 3d, at 922, it failed to apply the proper standard, as Judge Wicker explained. First, and most obviously, the court did not assess "what effect [the error] had upon the guilty verdict in the case at hand." *Sullivan*, 508 U. S., at 279. The court failed to ask, let alone attempt to answer, the core question: What effect did ADA Block's extensive testimony, including his wide-ranging commentary on and vouching for the State's evidence and testimony and his references to extra record evidence, have on the jury's deliberations? That inquiry, the Court has explained time and again, is the core of assessing harmless error. See, *e.g., Yates* v. *Evatt*, 500 U. S. 391, 408 (1991) (harmless-error analysis requires determining whether the error "contributed to the jury's verdict"); *Arizona* v. *Fulminante*, 499 U. S. 279, 296 (1991) (analyzing harmless error by asking whether the error "contribute[d] to [the defendant's] conviction"); *Harrington* v. *California*, 395 U. S. 250, 254 (1969) (harmless-error analysis "must be based on our own reading of the record and on what seems to us to have been the probable impact of the [error] on the minds of an average jury"); *Chapman*, 386 U. S., at 23–24 ("An error in admitting plainly relevant evidence which possibly influenced the jury adversely to a litigant cannot . . . be conceived of as harmless"); *Fahy* v. *Connecticut*, 375 U. S. 85, 86–87 (1963) ("We are not concerned here with

whether there was sufficient evidence on which the petitioner could have been convicted without the evidence complained of. The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction").

Instead of heeding this precedent, the court below imagined a hypothetical trial where the grand jury prosecutor did not testify, and concluded that sufficient evidence supported conviction. That is exactly the inquiry that this Court's harmless-error cases forbid.

C

Under the correct standard, ADA Block's testimony was clearly not harmless error. By using the weight of his office to vouch for and validate the State's evidence, and by opining on the conclusions to be drawn from that evidence, ADA Block's testimony created a legitimating lens through which the jury was invited to view the entirety of the State's case. It is thus impossible to say beyond a reasonable doubt that his pervasive testimony did not contribute to the jury's verdict. Three instances in particular illustrate how fully his testimony colored the jury's deliberations.

Consider first Anthony's human trafficking conviction. The court below found harmless error as to this conviction because "the undisputed testimony established that C. W. attempted to escape from defendant [once in Louisiana]." 309 So. 3d, at 922. Even assuming that is true, however, the court overlooked that the Louisiana crime of human trafficking for commercial sexual activity, as it then existed, had additional elements. Specifically, an individual had to defraud, force, or coerce the victim into providing sexual services for value gained. See La. Rev. Stat. Ann. §14:46.2 (West 2014) (effective Aug. 1, 2014 to July 31, 2016). The trial testimony related to this element was far from decisive. Lee testified that she and Grisby were not forced into prostitution, Tr. 335–336 (Dec. 9, 2016), and

C. W. acknowledged a history of voluntary prostitution, Tr. 63 (Dec. 11, 2016).

ADA Block's testimony, however, left no ambiguity on the matter. He repeatedly stated that the women were "victims of Willard Anthony . . . on a human trafficking, sex trafficking enterprise." 12/10 Tr. 156. Indeed, he cited this fact to explain why Lee and Grisby were not charged for participating in C. W.'s beating. *Ibid.* It is impossible to conclude that these remarks and others by ADA Block did not sway the jury to convict Anthony of human trafficking.

Consider next Anthony's conviction for aggravated battery with a handgun. While Anthony admitted beating C. W., he denied using his handgun to do so. Tr. 207 (Dec. 11, 2016). Lee, who was there for the beating, could not recall whether Anthony had his gun out. Tr. 317 (Dec. 9, 2016). ADA Block, however, boldly testified "I know that Willard Anthony assaulted [C. W.] with a handgun." 12/10 Tr. 141. Surely, this testimony was not harmless.

Finally, consider Anthony's convictions for aggravated rape. The jury instructions included a number of lesser included offenses as alternative verdicts. Record 319–322. A showing of prejudice here thus requires only reasonable doubt as to whether ADA Block's testimony contributed to the jury's decision to convict Anthony of aggravated rape, as opposed to a lesser included offense. The court below overlooked this critical point in its analysis. The omission is especially concerning given ADA Block's repeated testimony that a prosecutor would not charge an offense unless there was enough evidence to convict. In one characteristic remark, he explained: "[Y]ou have to meet the elements of the offense in order to charge the person and each and every element of the offense must be met beyond a reasonable doubt . . . . [I]f the evidence shows that the elements are not there . . . then I have a responsibility and an obligation not to charge someone with a crime." 12/10 Tr. 103–104. There is a reasonable possibility that this and other similar

statements influenced the jury's decision to convict Anthony of the most aggravated offenses with which he was charged.

## D

Our criminal justice system holds prosecutors to a high standard. The prosecutor is "the representative not of an ordinary party to a controversy, but of a sovereignty." *Berger*, 295 U. S., at 88. From that special role, "improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none." *Ibid.* It is an inescapable truth that the "power and force of the government tend to impart an implicit stamp of believability to what the prosecutor says." *Hall* v. *United States*, 419 F. 2d 582, 583–584 (CA5 1969).

These principles demand careful scrutiny of the rare cases in which a prosecutor takes the stand as a sworn witness in a jury trial. Because this case presents one of the most egregious instances of prosecutorial testimony amounting to prosecutorial misconduct, I respectfully dissent from the Court's refusal to issue a summary reversal.